Case number 19-7132 et al. Christiana Tah and Randolph McClain Appellants v. Global Witness Publishing, Inc. and Global Witness. Mr. Smola for the appellants, Mr. Bowman for the appellates. Good morning. Good morning, Counselor. Mr. Smola, we'll hear from you when you're ready. You need to unmute yourself and you can proceed. Good morning, Your Honors. May it please the Court. I am Rodney Smola on behalf of Christiana Tah and Randolph McClain. Your Honors, this appeal is more about the integrity of the federal rules than about the First Amendment. The District Court below analyzed all of the issues pending in this case and ruled in favor of Tah and McClain on all of them except the final one, the actual malice plausible pleading question. And I'll focus my initial attention and most of my attention in this argument on that final issue. The question before the Court is whether the complaint plausibly alleges actual malice as that term is defined by the various First Amendment standards and as that term is defined, as the word plausible is defined by the landmark decisions in Bell Atlantic Corporation v. Twomley and Ashcroft v. Iqbal. Twomley and Iqbal tell us that the word plausible means more than a possibility but less than a probability. But more than that, Twomley and Iqbal are very articulate in describing the sorts of things that will not do and the sorts of things that will push the plaintiff over the plausibility line. So what will not do? What's not good enough? Threadbare allegations are not good enough. Legal conclusions are not good enough. Formulaic recitals of the elements of a claim are not good enough. And the mere invocation of buzzwords is not good enough. So what will do? What is required? Well, what's required is that the plaintiff set forth sufficient factual detail that the legal elements of the claim might plausibly be proven. Critically, it's not necessary that the complaint prove the allegations. Of course not. It's not necessary that the complaint even show that there's a probability that the allegations would prevail. All that's required is a probability. And we think on this score, the district court below simply analyzed the case through the wrong prism. I want to commend to the court two very revealing sentences in the district court's opinion that we think show the mindset that got off the track here as the district court analyzed the complaint. The first comes at the very beginning of the district court's analysis of actual malice, and the second comes at the very end of that analysis in the very end of the opinion. The district court said at the beginning, and I'll quote it directly, quote, without more than is mustered here, there is not clear and convincing evidence that Global Witness was aware that its story was fabricated or too improbable to fabricate. And then at the end of the opinion, the district court says, without clear and convincing evidence of actual malice and only strands of evidence, plaintiff's pleadings fail to meet their burden. Well, that is the sort of language one would have expected on a ruling under a Rule 56 summary judgment motion. Mr. Small, why don't you focus for us on which allegations in the complaint you think are the most significant in terms of meeting your burden of proving malice or alleging malice? Instead of focusing on the district court's language, tell us which allegations should we look at that you think satisfy your burden of adequately alleging malice? Your Honor, the overarching theory of our complaint, buttressed by multiple allegations, and I should say, Your Honor, in 20 paragraphs and eight pages of text in the complaint, the arching theme is that from the very beginning, Global Witness was fixated on a story that was going to be alleging that Exxon facilitated or was complicit in bribery, and it did so when Rex Tillerson, who had now become Secretary of State under President Trump, was in control of Exxon. Well, isn't that the way investigative journalism works? They start out with a hypothesis. And, of course, that's true, Your Honor. However, it's our submission that if that hypothesis was the sort of hypothesis that was so predetermined and so fixated in the journalist's mind that they turned a blind eye to any contrary evidence and engaged in deliberate avoidance of the truth. Okay, so what is it that suggests that this was not a legitimate hypothesis but a pre-confirmed view, that they had their view before they began their investigation? What allegation responds to that? Your Honor, we point to multiple things that support that. Just tell us two of them. The first, Your Honor, is the letters that came a week before publication that went to my two clients but many other persons involved in these events as well as to the consultants who had analyzed this entire deal in which the journalist says unequivocally, we think you've taken bribes. Now, Your Honor, that could cut in two directions. That could have an inculpatory inference that this is a continuation of this fixation and that it had been made up from the beginning and that they were blind to anything that would counter that. And it could also have an innocent explanation, that they'd done their homework and now we're going through the motions of contacting the persons that were going to be targeted before they published. Our point is... But if this is standard, isn't this also standard investigative journalistic practice that at the end of an investigation, the journalist or the journal in this case contacts the target and says, here's what we think. This is what we think we found. Do you want to respond? Your Honor, yes. Yeah, and if we're a rule in this case that these letters fall on the wrong side in terms of your view here, then reporters will be taking a huge risk by writing a letter like this, won't they? Your Honor, we contest that, and we contest that because although that principle may be accurate ultimately after a fully developed record, the prior decisions of this court that articulate the thoughts that you've just described, Your Honor, all came after the plaintiffs had the benefit of a thorough investigation and a record. So if you look at the cases relied upon by Global Witness, relied upon by the district court, Fabula Reyes was after a jury trial. Lawrence v. Donnelly was after a fully developed record on summary judgment. Jankovic 3 was after a fully developed record on summary judgment. Counsel, you agree that the standard that you have to meet is set forth in Lawrence. There's obvious reasons to doubt the story. Isn't that correct? Yes, Your Honor, and I was the plaintiff's counsel in Lawrence, and as you know, in that case, that was elaborately developed in summary judgment, and the court ultimately ruled that despite all the notes, despite all the sources, despite all the references, we hadn't met the burden. And we think that what's key here, Judge Silverman, is the distinction between the standard on a rule 12B6 motion and the distinction between the standard on a motion for summary judgment. I'm not even sure you have to make that argument, counsel. What are your obvious, in your allegation, in your complaint, what are the obvious reasons to doubt that you assert the defense labored under? What are the obvious reasons to doubt? Well, among other things, Your Honor, the elaborate explanation by those that Global Witness contacted as to why it was utterly implausible that these were bribes, the fact that the money went to hundreds of people, all the way down to the custodial workers, the fact that the decision to initiate the payments was because this was a landmark deal for Liberia of the sort it had never had before, that the direction came from President Sirleaf, this Nobel Prize winning president, first person who was a woman head of state in Africa. There were many, many indications that this was a bet. Excuse me, counsel. What do you make of the statement that you refer to in the complaint, that Global Witness has no evidence that Exxon directed NoCal to pay Liberian officials, nor that Exxon knew such payments were, that Exxon even knew such payments were occurring? We think that statement helps us tremendously, Your Honor, because we think it's speaking with a forked tongue. On the one hand, what is overwhelmingly communicated here is that they've got the goods on Exxon and they've got the goods on these officials and they did it. And then they admit in the very same document they don't know whether they did it. And so they write a story creating the impression this is bribery, this is bribery, this is bribery. That's how we want you to see this story. But then they explain, well, we're not sure. And if you convey the impression... No, no, no. Isn't it stronger than that, counsel? We have no evidence. We have no evidence connecting Exxon to the money paid, incidentally, to 11 people, six members of the committee and five consultants. Absolutely, Your Honor. It is stronger than that. And I think that that is in itself enough to cross the threshold required by Twomley and Iqbal. It is at least plausible, given what they have said themselves, that this was communicated with reckless disregard for truth or falsity. Can I ask you the following question? So if all we have in a complaint is an allegation that the publisher said something like, you know, we believe you may have committed bribery, and then there's a vehement denial by the people to whom the correspondence is directed that says, no, that's absolutely false, that's not what happened. Is that enough to get past the pleadings? No, Chief Judge. I think that would be the kind of formulaic recitation, the kind of threadbare allegation. And it's our submission, obviously, that that's not our case. That we have all these other indicia. We have the fact that curiously, although they accused the consultants of bribery, they drop out of the picture. Although the advisor to the president, someone who would be sort of akin to a White House counsel in the United States, who had approved the deal, he doesn't show up in the final allegations. There are all these different pieces. And as we have strongly urged, in any defamation case, these are all that most plaintiffs will ever have at this early stage, before they can look at e-mails, before they can look at text messages, before they can depose sources, before they can examine the journalist, before they can see the earlier drafts, before they can see what the editor said to the journalist, this might be a good story to go forward. So even as Your Honor has said, there may be some element to this that tracks routine journalistic practices. There's also a pattern here that tracks the way defamation cases operate in the real world. And we think that there's no fair characterizing our opinion as threadbare or relying only on buzzwords. It's factually laden. It goes deeply into everything that's in this Global Witness Report and the inferences to which we are entitled. Just as in baseball, when Ty goes to the runner, in a case like this, if there are multiple inferences possible, we must get all of them at the front end. Your Honors, I've spent all my time on this issue, and I know that there are many others, and I know you'll hear from my friend Mr. Bowman on many others. I do want to say at the front end, and I'm sure I'll have a little bit of a chance to talk about this on rebuttal, that on the slap issue here, we think the case is extremely simple. There is simply still today a dissonance between the standard under 12b-6 and the standard under the District of Columbia anti-slap law. Under the anti-slap law, the plaintiff must adduce evidence to defeat the slap claim. Nothing like that is required under Rule 12b-6. In fact, it's not permitted. And under the anti-slap law, the burden shifts to the plaintiff once the prima facie case is shown, the exact opposite of the burden in defeating a Rule 12b-6 motion. So this court's prior panel decision in Abbess was not superseded by Mann. It remains the law of the circuit, and this court ought not revisit it. Can I just ask you one question on this anti-slap issue? Yes. And we will give you some time for rebuttal. You haven't taken a position in argument today or in your briefing that we don't need to reach that issue. Your point is just on the merits that if, assuming we do reach the issue, that you ought to prevail and the anti-slap statute is not properly before us because of Abbess. Actually, Your Honor, I think we take both positions. We say very forthrightly we don't think it's appropriate for the panel to entertain the issue because Abbess is the binding precedent of this circuit. Now, the other side says – That is entertaining the issue. It's just that Abbess resolves it. Abbess resolves it. I think the two effectively come together because there is this narrow band of exception that says if there's an intervening decision that absolutely abrogates a prior decision, a subsequent panel may be permitted. But if there isn't, if Mann does not constitute that, then Abbess remains good law. So the merits and the power of the panel, I think, Your Honor, in effect come together. I guess what I'm saying is what's at stake for the other side on that issue is the possibility of obtaining attorney's fees. So one could make the argument that if that's what's at stake, then there's no need to reach the issue at all. You're not taking that position. You're saying reach the issue, but then rule in our favor because Abbess, Abbass, however you say it, still governs. You haven't made that argument. Just to be careful, Your Honor, we do say – we don't place great emphasis on it, but we do say that even if we're wrong on the merits and you were to overrule Abbess and say that the SLAPP law applies, the court ought to use its inherent authority to announce that prospectively because clearly it would be a terrible trap for the unwary for us to suddenly be saddled with attorney's fees when we forthrightly admit that we chose the federal district court forum because we had been led to believe by many district court opinions and this court's opinion that the anti-SLAPP law did not apply. Counsel, weren't you asked to address the question of standing on the part of the defendants cross-appeal? Your Honor, and we don't contest that they have standing. I'm a little puzzled why nobody contests because the Supreme Court has specifically said in Steel Co. that attorney's fees are not injury in fact. Your Honor, we'd be delighted for you to follow that line, of course. I think the reason that I'm hesitant to contest it is they clearly get a tangible procedural advantage in the case if they get the benefit of the SLAPP law. I think a party probably has standing to say I'm entitled to that but that's the very reason we should win because if they get that tangible procedural benefit, by definition it's inconsistent with the federal rule. Actually, I really don't care what the party says because that's a matter on which we have to rule independently. If there is no injury in fact, there's no grounds for cross-appeal here on the part of the defendant. Let's go on because it may well be unnecessary to even reach the SLAPP statute. I appreciate that, Your Honor. Okay, thank you. Unless my colleagues have further questions for you on your opening argument, we'll let Mr. Bowman go and then you'll get rebuttal time. Just to outline the procedure, since there is a cross-appeal, you'll both get a bit of rebuttal time. Thank you, Your Honor. Thank you, Your Honor. Mr. Bowman. Chad Bowman on behalf of Global Witness and Global Witness Publishing Inc. May it please the court. This is a defamation case brought by two former senior Liberian officials against a non-profit organization that published a white paper, a non-profit organization that has a long history of working with the Liberian people to increase the accountability of their government. Counsel, may I suggest, because there's a limited time, that you go immediately to the actual malice question, assuming arguendo, that a libel has been made out. I wouldn't be surprised if the three judges are most interested in the question of actual malice. Yes, Your Honor, of course. We don't dispute in a 12B6 motion that the tie goes to the runner. Our position is this case does not pose anything close to a tie. In this case, the district court looked at the pleaded allegations of actual malice in the complaint and asked the question, those pleaded allegations, assuming the factual allegations are true, plausibly establish actual malice under the standards of this court as set forth by the Jenkovich court, the Lorenz court, and all of the decisions in this court recognizing the high burden that a plaintiff has to meet. And the court said no. To ask you a question about Lorenz, which I said, you agree. The question is, are there obvious reasons to doubt the story? That's the standard in Lorenz, right? Yes, it's one of the hard-hanged standards, yes, Your Honor. If there are obvious reasons to doubt a story such that there is a high degree of awareness of probable falsity, that would be actual malice. All right, good. So in turn, asking whether there's an obvious reason to doubt, you have a mixture of objective standards and subjective. The obvious reasons to doubt is an objective standard leading to a conclusion about subjective motivation. I think it's a subjective standard, Your Honor. No, of course. You had subjective reasons to doubt. Obvious reasons is an objective standard. Yes, Your Honor. Okay. What I think is important here to remember and to emphasize, and I don't mean to move off actual malice, but this report, 35-page report with 125 footnotes, the plaintiffs don't cite any false facts in the report. Everything published in the report — Now you're getting on the question of — Yes. And I suggest to you that you should focus on actual malice. Yes, Your Honor. So with actual malice, you're talking about an awareness of likely falsity of an inference. You have here the allegation from plaintiffs that — Excuse me. The standard is obvious reasons to doubt. Yes, Your Honor. That's the standard in Lorenz. Yes, Your Honor. Were there obvious reasons to doubt or not? No, Your Honor, there were not. And in fact, plaintiffs concedes that, or the plaintiffs concede that in their briefing, that the global witness published the report raising the question, not knowing whether it was true or false. They investigated whether or not these admitted payments, these bonus payments that were received by these officials that were larger than their annual salary, following the completion of the transaction, were legal. They asked — Excuse me, counsel, are you referring to page 48 of their brief? I'm referring to page 15 of their brief, Your Honor. Well, it's also on 48. In other words, former librarian officials concede that global witness did not know whether the payments were illegal. That concession alone negates the possibility of sufficient actual malice pleading. That's your point? My point is we read that differently. That concession by the appellants here concedes there wasn't a subjective awareness of falsity. The report itself said, here are all the facts. Actually — They don't know whether or not this rose to the level of bribery. There should be an investigation. We are raising that as a question. Excuse me, counsel. If you look at page 36 of their brief, it states global witness subjectively knew that it had not been able to determine whether the payments to Ta and McLean were corrupt bribery payments. If that had been all they said, you would be right. But if they go on to say, yet without resolving that subjective doubt and notwithstanding the material in its possession that generated a high degree of subjective awareness that their story was false. So, in other words, they go beyond your contention. They say you didn't know, but you ignored evidence that the story was false. Your Honor, we dispute that there was evidence. Global witness contacted each of the sources — I'm only making the point that they didn't make the concession that you said they didn't make. Yes, Your Honor. Our point, Your Honor, is that the allegations will take into three buckets. The allegations of a preconceived narrative. This court has been clear in the Jankovich decision. A preconceived narrative is the nature, as Judge Hadle mentioned, of investigative journalism. You go out and you test theories. A preconceived notion, an allegation of a preconceived notion of a story, is only evidence of actual malice if it's coupled with facts that plausibly suggest that someone wanted to fulfill that preconceived narrative through falsity. There's no allegation, factual allegation here of that. Wait a minute, counsel. I agree with you that that preconceived notion is not the strongest part of their case. But what is, it seems to me, a lot stronger, is the fact that you specifically say global witness has no evidence that Exxon directed NoCal to pay librarian officials, nor that Exxon even knew such payments were occurring. Now, I realize you put that in in order to rebut the libel action, the first step. But why isn't that injurious to your position on actual malice? Our position is actual malice requires an awareness of subjective falsity, Your Honor. Well, okay. You have, let's assume, arguendo, that the first step is made out. There's an implication of bribery. Now, in which case, who are the bribees? The bribees would be the individuals who received the largest payments and voted for the deal. And why would that include the consultants who got $15,000 apiece? You're speaking about the omission. The report is clear. It says it named the individuals who voted for the program. There were many more who received bonuses, you know, including the consultants. All right, I see your point. So there's six people who are the bribees, right? In your hypothetical, Your Honor, yes. Well, no, it's your case, isn't it? The six people are the bribees, right? Our position is that global witness asked a question and called for investigation. Well, you have to assume, for purposes of my question, you have to assume the first point has been raised, made out the way the district judge said. I accept that, Your Honor. Assuming that to be the case, yes. Okay, now, the bribees are six people, at least six people, right? Yes, Your Honor. This is all quite public, right? I'm not sure I follow that. There's no secrecy about this. There's no secrecy. That's right. These six people got $35,000. There's no secrecy, Your Honor. It's also true that you have zero evidence that Exxon had any knowledge of these payments. I say no secrecy, Your Honor. There's no secrecy because a Liberian good government law, which Global Witness helped champion, required the publication of that information. And the point of this report was to encourage the publication of similar information in the United States so that we would have access to. You're avoiding my question. The bribees are at least the six individuals who got $35,000. Correct. It's undisputed, according to you, that there's zero evidence that Exxon had any knowledge of these payments. Global Witness included in their report that they did not have evidence of that payment, which is why they called for an investigation. All right, wait a minute. Now, if you're alleging bribery, which of course is the first step, we're assuming arguendo, then the bribees are this six people. And yet you have zero evidence of any privity between Exxon and these individuals concerning a bribe. Isn't that correct? It was not inherently improbable, given the history of this oil concession. Why isn't it inherently probable? This is all public. Bribes take place in the dark of the night. I think not always, Your Honor. In 2007, the Liberian government investigated and adjudicated that there was in fact bribery over this very oil concession when it was privatized. We don't know any of the facts about how that bribery was determined. But isn't it true, bribery is a crime, right? It is a crime, Your Honor. You don't normally advertise it publicly and saying everybody got $35,000. It's undisputed that this happened after the deal was over. It's undisputed. You have no evidence connecting Exxon to these payments, none at all. So why isn't that per se actual malice? It's inherently... Objective reasons to doubt the truth of the implication. It's public. According to your view, Exxon is spreading bribes around like Johnny Appleseed. It's absolutely public. And you have zero evidence connecting Exxon to the payments. Well, Your Honor, Exxon doesn't mean... But you imply that Exxon bribed them. Your Honor, Exxon doesn't need to be the bribe payer, in your hypothetical. In the 2007 situation, the bribes were not paid by the foreign oil company. The bribes were paid internally to get the legislature to approve. But didn't your article imply that Exxon did the bribing? The article asked the question whether it was appropriate for Exxon to provide a pool of money to be distributed to the people who voted for the deal. Bribery, Your Honor, is a conclusion. Where do you have any evidence that Exxon provided a pool of money to be distributed as bonuses? You raised the question whether Exxon did. The bonuses were paid... You can't raise a question without any evidence at all. An allegation of bribery without any evidence at all? Your Honor, the evidence is that the pool of money was paid as part of the 2013 transaction. Following that transaction, a pool of bonuses was paid. The report raised the question based on these disclosed facts whether or not that was proper, including whether or not that violated bribery laws. Now you're going back to the original question of whether there's an implication of bribery. And I've asked you to assume, arguendo, there is an implication of bribery. Because that's the first step, right? You see the point? Once an implication of bribery, then you have the briber is Exxon. And who are the bribees? There's six people who publicly are disclosed as getting a bonus. There is zero evidence that although there's an implication in your article that Exxon did the bribing, you have zero evidence connecting Exxon to this money. The money, I'm not sure that's true, Your Honor. The money was paid as part of the transaction. And it was expressly tied after the transaction as for a job well done to the people who worked on the deal. And I take your point. Under that theory, as an ex-banker, I can tell you, under that theory, every investment banker who takes a share of the transactions in a sale of a corporation to another would be guilty of bribery. Slightly different, Your Honor, when they're public servants who are not supposed to necessarily receive bonuses for... So you think the fact that they got bonuses is per se evidence of bribery? I didn't say that, Your Honor. It's per se evidence that Global Witness thought it should be investigated, given the history of this oil concession. Now you're back to the basic point. Let's assume you implied bribery. If you assume arguably implied bribery, I'm trying to examine whether you have any evidence that rebuts actual malice. Or doesn't this inherently improbable to use another standard that this bribe would be so public without any indication, no privity between Exxon and these bonus payments? Zero. May I answer the question, Your Honor? Yes. Yes. I think the evidentiary burden is on appellant to show awareness of falsity here. I take your point that you're asking what affirmative evidence does Global Witness have if you assume it made an implication that it did not squarely make in its report of bribery. I would say the evidence is that Global Witness sought comment. Global Witness included comment. Global Witness set forth all the bases that it understood why it was asking for an investigation, which I believe, taken in the full context of the report, illustrates that potentially corrupt or improper or bribes are not inherently improbable in Liberia when you're dealing with the disposition of state assets like the oil license. We should just assume that Liberia is corrupt. I wouldn't say that, Your Honor. However, this particular oil concession did have a history of corruption, one that was acknowledged by Exxon when it proposed a multi-step transaction because it was concerned with U.S. money laundering laws given the original privatization of the 2007 concession and given the... That goes back to the first question, whether there's an implication of bribery. I take your point, Your Honor. So if you assume the... You keep taking the point, but if you... Let's say you take the point and you can't have the response that you've tried to make several times, which is that all you were doing was raising a question because that does fight the premise of the line of questioning, right? So if you can't just say, all we were doing is raising a question and you have to assume that there was an implication of bribery, then do you accept the proposition that if there was an implication of bribery, there were obvious reasons to doubt whether there was bribery? We do not, Your Honor. Our position is if we came out... If the Global Witness report came out and said, we think these are bribes, the reasons we think these are bribes are completely set out in the report. Everything from the history of the transaction to the large payments that were unusual, there's no dispute that payments like this had never been made to these individuals. There's no dispute that the legality of accepting these payments was decided by the people who were going to receive them. It's not disputed. It's alleged in the complaint that the person who decided to give the... To make the bonus, the president, her son received one of those payments. All of those facts are set forth in the report, including the responses of the individuals that Global Witness was going to name as people who both received bonuses far in excess of their annual salary and voted for the transaction that provided the funds for those. Having laid out all of that evidence, if it came out... If Global Witness had come out and said, we think these are bribes, that's a conclusion. That's a conclusion amply supported by the disclosed facts that lead to that conclusion. And there are no obvious red flags. So you're still back on the first issue. And that's, I think, shows the weakness of your actual malice argument because you keep coming back to the first question, denying there's any implication of bribery. All right. The plaintiffs... May I respond to the specific points the plaintiff raised about alleging actual malice, Your Honor? It's on actual malice, yeah. Yes, it's on actual malice. The alleged omissions. The district court, I think, properly regarded that as somewhat of a non sequitur because the report expressly said, these are the individuals who both voted for the transaction and received the large bonuses. The idea that there were others who also received bonuses that were smaller and didn't vote for the report, that is not an obvious red flag that not disclosing that somehow illustrates that Global Witness knew what it published was false. That's the theory on, you know, I think I already discussed a little bit the theory on a predetermined agenda. Essentially, the fact that Global Witness sought comment from the individuals it was going to report about is being spun as somehow they knew it was false. They asked, they said, this is what we believe based on the information we have. What is your response in light of that response? A little stronger than that was an accusation, wasn't it? I think the actual language of the letters, Your Honor, is we believe this is likely bribes under Liberian law. How do you respond? That's what I call an accusation. And Global Witness took those responses, decided ultimately not to make the allocation in its report, and also included the responses and the explanations by those officials in the report. I don't think that's probative of a high degree of awareness of probable falsity. That's probative of an intent to portray fairly a complex factual situation. A situation that Global Witness struggled with. So you have the omissions, the alleged omissions, the alleged preconceived narrative. I think that's essentially what the plaintiff has, other than this idea that it's inherently improbable in the disposition of a Liberian oil asset that it's impossible that there could be bribes paid. And what I would say... Wait, wait, wait. Isn't the standard impossible? Improbable. Inherently improbable. Your Honor, it happened before with regard to that precise concession just a few years earlier. So our position, it's not inherently improbable that those could have been bribes. Well, the question is, lest we use Lorenz, is there an objective reason to doubt the story? And you're back to the problem that you have zero evidence connecting Exxon to these payments. Zero. They take place after the deal is finished. You have zero evidence indicate that Exxon even knew about the bonus payments. That's correct, Your Honor. And the report says as much. I'm not going to dispute that. That's true. Yeah, but that seems to me that undercuts enormously your defense on actual malice. Okay. Let me make sure that my colleagues don't have further questions. I just have one question just on the anti-SLAPP issue. I'm sorry to take them over further, but I'd just like the counsel to give us on the anti-SLAPP issue. Could you... The D.C. Court of Appeals opinion that came out after the brief for file read in that case? Yes, Your Honor. Why doesn't that totally resolve this question of the applicability of the anti-SLAPP statute? Because it makes clear that it's absolutely impossible. As I read Mann, Your Honor... No, I asked you about Fred. I asked you about the new decision. Yes, Your Honor. I'm just explaining how that led into the Friedman versus Orbis intelligence case. The standard for both Mann and Orbis is to avoid the conflict with the federal rules or constitutional issues. The standard, the likely to succeed on the merits is that the plaintiff can't succeed as a matter of law. It's equivalent to 12 or 56. In most anti-SLAPP cases, defendants will proffer evidence, and it will be the equivalent of a Rule 56 motion, which under Rule 56, in early Rule 56 motion, the respondent can explain that it needs discovery. In our case, it's a little bit different. We moved to dismiss under Rule 12b6 for failure to state a claim, and no discovery was necessary, but I think if a claim is insufficient as a matter of law under Rule 12b6, it can't be likely to succeed on the merits because the claimant cannot prevail as a matter of law under Mann and under Orbis. I agree with you. In Friedman, the case was treated essentially like a Rule 56 based on evidence, but I don't think that's the way that an anti-SLAPP motion needs to be treated. Can I just ask you about the way this issue gets teed up because there's an appeal, there's a cross-appeal, there's the underlying question of whether there's actual malice, and there's the anti-SLAPP issue, so there's a number of ways that we can do the decision tree, but let's just suppose, I know you're going to resist this, but let's just suppose that on the appeal that the decision is made to send it back on actual malice because the Court of Appeals concludes that there's enough to get past the pleadings at least on actual malice, not that anybody's going to get home, but that there's enough to get past the pleadings. Then is there still a need to address the anti-SLAPP issue? And I guess your argument would be, I'm thinking your argument would be, but correct me if I'm wrong, there would be because in order, if the anti-SLAPP statute does apply, then that would impose a greater evidentiary burden on the plaintiffs, and if it did impose a greater evidentiary burden on the plaintiffs, then they might not have met that burden even if they met Normal 12b-6, and if they haven't met the anti-SLAPP burden and the anti-SLAPP provision does apply, then you still win at the pleading stage. Is that what you would say, or am I not understanding your argument? Your Honor, I don't believe so. I believe our argument in the district court was that the anti-SLAPP motion we prevailed on for the same reasons as the 12b-6, so we were aligning the standards under the federal rules with the anti-SLAPP. I believe if the court were to say that the motion to dismiss was denied, given that the anti-SLAPP on its merits incorporated the arguments of the motion to dismiss, I think that the anti-SLAPP was denied as well. Because you're more beholden to the position that anti-SLAPP didn't do anything. Then you are to the position that you want to get something extra out of the anti-SLAPP. I think that Abbas forecloses getting something extra out of the anti-SLAPP case, Your Honor. I think that for the anti-SLAPP statute to apply in federal court, the standards need to be in alignment with Rule 12 or Rule 56. We didn't bring a Rule 56 anti-SLAPP motion, we brought a Rule 12 anti-SLAPP motion. Okay. All right, let me make sure my colleagues don't have further questions at this point. No. No. Thank you. Mr. Smola, why don't we give you three minutes for your rebuttal? Thank you, Your Honors. And first, just very quickly on the anti-SLAPP, I think that the dialogue that we've just heard resolves the case in our favor because they can't have it both ways. And to the extent that it applies automatically, it imposes more procedural burdens on us than we would otherwise have. I want to just turn to the merits and again, I don't think I need to be very long because the dialogue between the court and Mr. Bowman and the dialogue between the court and me have already, I think, eliminated the pivotal issue. So I'd just like to connect the dots in a few ways. First, there is an interconnectedness between the underlying falsity issue. Did this allege bribery? Would a reader come away from this thinking they are saying these folks took bribes? There's an inherent interconnectedness between that issue and the actual malice issue. And you saw it revealed constantly when pressed, Mr. Bowman would constantly fall back on all we were doing was asking questions, all we were doing was calling for an investigation. And as I have conceded to Chief Judge Srinivasan, if that is all they were doing, we don't have a case. But the district court found that was not all they were doing. And when you read the report, I'm sure the court will say that it is at least very plausible that's not all they were doing, that they were affirmatively making the case, this is a bribe, this is a bribe, this is a bribe. And yet, as you've already seen revealed, juxtaposed with that is obvious reasons to doubt. And the last thing I want to say that remember, we don't have to prove the obvious reasons to doubt. At this stage, we just have to have plausible allegations of obvious reasons to doubt. And as the quoted sections from our brief reveal in the dialogue between Judge Silberman and Mr. Bowman, our hypothesis is they have essentially conceded they have obvious reasons to doubt. They say so essentially in the text. And given that, this case should move forward into discovery. Thank you, Your Honors. Can I ask you just one question, just a factual one. So there's a letter that has the language that Judge Silberman was quoting. I just want to double check. And it says there's no evidence that Exxon was aware of these payments. Is that in the complaint? Yes, Your Honor. And Your Honor, I don't remember where, but what I will say is that the entire report was incorporated in the complaint and we rely on the entire report. And so I think that the court can look to anything in the complaint or the report as illuminating obvious reasons to doubt. Yeah, that may be so. I was just wondering if that particular language was pointed out in the complaint. And Your Honor, I don't, it's a long complaint. I don't remember. Okay. Thanks. All right. Thank you, Mr. Small. Mr. Bowman, since there's a cross appeal, we'll give you rebuttal time too. And why don't you limit the argument on your rebuttal to the cross appeal. And we'll give you. Yes, Your Honor. Although may I correct one misstatement I made in response to a question from Judge Silberman? Yes. Judge Silberman asked about the public nature of the bonuses. I was mistaken. I'd forgotten. The bonuses were not public until Global Witness revealed them. Global Witness was, its report was the one that revealed those. So I just wanted to correct that, that misstatement. On the cross appeal, I think the issue is fairly straightforward that man attempted to reconcile and interpret for the first time the standard for prevailing under the anti-slap statute, which was the precise issue that a boss found conflicted with the federal rules. Man clearly said, we find that it comports with the federal rules. Given that there's now alignment between the substantive standard to dismiss a case prior to trial, there is not the same conflict that existed. I don't understand how there's alignment because under man itself and under the subsequent case, but even under man itself, there still needs to be some evidence. And usually under 12b-6, there's just not. Right. And that, Your Honor, is the distinction between a Rule 12 motion and a Rule 56 motion. I mean, certainly, if you're going to bring the type of anti-slap motion to put forward evidence, then it's essentially now treated as a Rule 56 motion. And the defendant has to prove there's no dispute of material fact. It would be an odd outcome to have a statute aimed at protecting speakers like Global Witness, speakers that have been dragged into litigation and exposed to the expense and harassment of litigation on matters of public concern one too early. And so our position is that a Rule 12 motion, as a matter of law, you don't have to get to Rule 56. If a complaint can't survive Rule 12, it also doesn't survive Rule 56, and therefore the claimant isn't likely to succeed on that motion. There's a different standard. As I understand the D.C. Court of Appeals decisions, you have to do more to get past a Rule 12 motion in D.C. court than you would in federal court under the anti-slap statute. And if that's true, then when it gets in federal court, the federal rules trump the anti-slap statute. It's true, Your Honor. You have to do more than a motion to dismiss in state court if you rely on evidence. But those procedural rules of a motion to dismiss don't apply in federal court. You only have Rule 12 or 56. And, you know, our position is that you can't be likely to succeed on the merits, as the Mann case said, where a claimant could not prevail as a matter of law. If you can't stay the claim under Rule 12 as a matter of law. Okay. All right. If my colleagues don't have any further questions at this point, Mr. Bowman, Mr. Smola, thank you for your arguments. The case is submitted. Thank you, Your Honor. Thank you.
judges: Srinivasan, Tatel, Silberman